## STATE OF NORTH CAROLINA *v.* KIRKPATRICK *et al.*

*(Circuit Court, W. D. North Carolina.* April Term, 1890.)

1. REMOVAL OF CAUSES—CRIMINAL PROSECUTION.
   Under Rev. St. U. S. § 643, which provides that, when any civil suit or criminal prosecution "is commenced" in a state court for an act done by an officer under the revenue laws of the United States, the same may be removed into the United States circuit court, a prosecution is "commenced" when the warrant is issued and the arrest made by the state officers, and it is no objection to the removal that no indictment has yet been found in the state court, and that there is no provision in the federal law for indictment for offenses against the state law.

2. SAME—FURTHER PROCEEDINGS IN STATE COURT.
   Under said section, which declares that after removal "any further proceeding, trial, or judgment therein in the state court shall be void," an indictment found in a state court after the removal of the cause to the United States circuit court was null; and where, upon *habeas corpus cum causa,* it appears that the prisoners were in the discharge of their duty as revenue officers of the United States when the act was committed, and were without fault, they will be discharged.

3. CONFEDERATES IN CRIME—REVENUE OFFICERS.
   The rule that confederates in an unlawful undertaking are each responsible for the evil consequences that ensue does not apply where a homicide was committed by one of a party of revenue officers while the party was engaged in the duty of searching for illicit distilleries.

4. REVENUE OFFICERS—ILLICIT DISTILLERIES—JUSTIFIABLE HOMICIDE.
   Revenue officers searching for illicit distilleries came upon a furnace from which the still fixtures had been recently removed. A man was seen observing their movements, who afterwards offered to conduct them to a certain house, and walked in front of them for that purpose. Soon he began to run towards the house, and the officers ran after him, when he seized a gun, fired upon and wounded one of them, and was shot by another. *Held,* that the officers were warranted in suspecting him of an intention to warn guilty parties, and, although they had no warrant for his arrest, were justified in running after him to frustrate that design.

Preliminary Examination on *habeas corpus cum causa.*

Rev. St. U. S. § 643, provides that, "when any civil suit or criminal prosecution is commenced in any court of a state against any officer appointed under or acting by authority of any revenue law of the United States, * * * on account of any act done under color of his office, * * * the said suit or prosecution may, at any time before the trial or final hearing thereof, be removed for trial into the circuit court next to be holden in the district where the same is pending; * * * and any further proceedings, trial, or judgment therein in the state court shall be void."

*Isaac Strayhorn* and *Robert Winston,* for the State.

*Jas. E. Boyd, W. S. Ball, W. P. Bynum,* and *Chas. Price,* U. S. Atty., for defendants.

DICK, J. The petition for the removal of this case into this court, and for a writ of *habeas corpus cum causa,* was duly filed in the office of the clerk of this court on the 6th day of March, 1890, under the provisions of section 643 of the Revised Statutes of the United States. As the circuit court was not then in session, the clerk, being of the opinion that the averments in the petition were sufficient for the removal of this case under the provisions of said statute, entered the case on the record of this court. As it further appeared that the petitioners were in actual

custody under due process issued by state authority, the clerk issued a writ of *habeas corpus cum causa* to the marshal of this district, together with a duplicate, to be served on the clerk of the state court for the county in which the homicide occurred.   By virtue of such writs the marshal took the bodies of the petitioners into his custody, and on the 11th day of March, 1890, produced them before this court, then in session in this city.   As the clerk of the state court had not made a return of a copy of the process under which the defendants were arrested, and the solicitor for the state was not present, the court ordered that the case be continued until the 14th, and that due notice be given the state solicitor.   On the 14th of March the solicitor was not present.   At his request, communicated by the counsel for the defense, and with the consent of the petitioners, the case was continued to the 7th day of April, the first day of this regular term of court.   The case now being before the court for hearing, consideration, and action, the counsel for the prosecution made a motion to dismiss the proceedings for removal, upon the ground that this court had no jurisdiction; for, at the time when the petition was filed and the writ of *habeas corpus* was issued, no bill of indictment had been found against the petitioners by a grand jury in a state case, and there is no provision of law for the finding of a bill in a United States court for an offense against a law of the state.

I am of the opinion that, under the proceedings for the removal of this case from the state tribunal, this court has acquired full jurisdiction to hear, try, and determine all questions of law, and all matters of fact involved.   The prosecution was commenced when the warrant of the justice of the peace was issued, and the petitioners were arrested.   This opinion is founded upon a fair and reasonable construction of the language, purpose, and spirit of the statute under which these proceedings were instituted.   It is also supported by carefully considered opinions delivered in United States courts.   *State* v. *Port*, 3 Fed. Rep. 117; *State* v. *Bolton*, 11 Fed. Rep. 217; *Tennessee* v. *Davis*, 100 U. S. 257.

I regard a further discussion of these questions of law as unnecessary. The motion to dismiss is disallowed.

The material averments made in the petition bring this case clearly within the provisions of section 643 of the Revised Statutes of the United States, and the proceedings have been legally and regularly instituted. After hearing the evidence on both sides, and the arguments of counsel, I am of the opinion that there is not even slight evidence tending to show that L. M. Cates, A. T. Dodson, and W. T. Dickson had any participation in the unpremeditated homicide.   The rule of law that confederates in an unlawful undertaking or transaction are each personally responsible for the evil consequences that ensue does not apply to this case.   These parties were engaged in the performance of a legal duty, under the direction of superior officers of the law, and in no way exceeded the scope of their legal duty and authority.   As there are no grounds for holding L. M. Cates, A. I. Dodson, and W. I. Dickson for further prosecution, it is ordered that they be discharged.   As there is some conflict in the evidence as to the conduct of the revenue officers S. Kirk-

patrick and A. C. Patterson in the unfortunate transaction, I will hold them under their bonds until I can give the testimony my most careful consideration. I will also reserve for further consideration the question of law presented by the certified copy of the record of the superior court of Orange, showing that a bill of indictment has been found in said superior court against the petitioners for the alleged murder of Henry McMannen. It appears that said indictment was found in said state court after the removal of the case to this court. I will, during the next eight days of this term, hear further argument as to the force and effect of the proceedings in the state court, if counsel desire to present their views more fully.

---

(April 18, 1890.)

DICK, J. Since hearing the evidence in this case, and the motions and arguments of counsel on the first day of this term, I have carefully considered the questions of law and the matters of fact then reserved. I am of the opinion that the bill of indictment found by the grand jury in the state court, after the removal, and during the pendency of this case in this court, is null and void, and cannot be the foundation for a prosecution of the alleged offense in this or any other court. The statute under which the proceedings for the removal of this case into this court were instituted expressly declares that after the removal "any further proceeding, trial, or judgment therein in the state court shall be void." The language of the statute is direct and positive, and there can be no correct judicial interpretation and action other than giving force and effect to this clear expression of the legislative will of congress. The statute is constitutional, and is a supreme law of the land. When this court has acquired jurisdiction under this statute of the parties and subject-matter of this case, no other court can institute proceedings for the prosecution of the parties for such alleged offense. The jurisdiction of this court, when thus acquired, is for all purposes exclusive.

From my recollection of the testimony set forth in the written statement which will be filed with this opinion, I have formed the following conclusions as to the material facts in this case: I find that S. Kirkpatrick and A. C. Patterson were duly-authorized revenue officers of the United States, and were in the performance of official duty, in searching for illicit distilleries, which they had been informed were in operation in that neighborhood; that while so engaged, about sunrise of the morning of the 25th of February, they discovered in the woods, and near a branch, the remains of a furnace of a deserted illicit distillery, and found McMannen. standing not far off, observing their movements; that no arrest was made and no menacing language was used, and McMannen voluntarily agreed to show them the house of Mr. Hunt, and went in front of the officers for that professed purpose; that the officers did not know that the house they saw, not far from the discovered furnace, was the house of McMannen; that the officers had reasonable grounds for suspecting that McMannen, when he reached the path lead-

ing to the house, intended to delay or mislead them in their search, and that when he started to run towards the house his purpose was to communicate information to the illicit distillers in the neighborhood, as the house to which he was going was not far from the place where the deserted distillery furnace had been discovered; that when the officers followed rapidly they had no purpose of doing any violence to McMannen, but merely wished to frustrate his design of communicating information; that the officers did not draw their pistols from their belts until they saw McMannen seize the gun on the bed, or on the table, in the house; that McMannen fired the first shot into the face of Kirkpatrick, who fell from his horse, and discharged his pistol while falling, and the ball struck the rock near the door-sill; that Patterson then dismounted, went behind the house, entered the back door, and fired the fatal shot as McMannen was presenting his gun and was about to fire upon Mr. Dickson, who was in the road in front of the door. I am not able to form a definite opinion as to the place where the ball entered the body of McMannen. From the testimony of Patterson and from the range of the ball, McMannen must have been standing with his side towards Patterson. If the left side was towards Patterson, the ball could have entered the left breast. If the right side was presented, the ball must have entered under the shoulder blade. I am not able to form a satisfactory opinion as to the ball found in the log in the back side of the house. I feel sure that the ball fired by Kirkpatrick struck the rock near the door-sill. I have formed these conclusions as to facts from the testimony of Patterson, Cates, and Dickson, who were present, and had better opportunity of seeing and hearing everything that occurred than Martha McMannen, who was 75 yards distant. Her testimony confirmed the statement of the other witnesses as to McMannen presenting the gun at Dickson, for she said that when her brother staggered out of the door he was holding the gun across his breast. A. I. Dodson was not examined, but the counsel for the defense stated in open court that his testimony would fully sustain the officers who had testified. He was present in court, and the state counsel had opportunity of examining him. Kirkpatrick was in Baltimore, under the care of a physician. He was wounded too severely to be before the court on former occasions.

Cates, Dickson, and Dodson in no way counseled or participated in the homicide. They were not summoned by Kirkpatrick or Patterson, but were present in the performance of duties directed by their immediate superior officer. They are men of good character, and have no motive to induce false testimony. The testimony of William and John Overaker, who were 350 yards distant, is merely the expression of an opinion as to the succession of the shots, from the nature of the sound. Such testimony is not sufficient to overcome the direct and positive testimony of the witnesses who were present, and could both see and hear. The shots of McMannen and Patterson were both fired in the house, and the reports were thus, in some degree, obstructed. The pistol of Kirkpatrick was of large calibre, and was fired in the open air, and may have seemed to be the loudest report to persons at a distance. Such supposi-

tion reconciles the testimony of the Overakers with that of the officers. Kirkpatrick and Patterson, as revenue officers, were in the performance of official duty. They had received reliable information that there were two illict distilleries in that neighborhood in full operation. The nature of their duties in searching for illicit distilleries required vigilance, secrecy, and promptitude of action. They had, very early in the morning, reached the neighborhood, and had discovered a furnace from which the still and fixtures had been removed. They had found McMannen at that early hour near the furnace, observing their movements. From his conversation and action they had reason to suspect his connection or sympathy with illicit distillers. When he ran towards the house, which was near to the discovered furnace, without any explanation of such conduct, they had reason to suspect an evil motive, and had a right to keep him in view for the purpose of frustrating the suspected design, provided that they did not arrest him, or threaten him with personal violence. They had no right to arrest him without a warrant, but they had a right to watch him, and thus keep him from communicating information to violators of the law that would enable them to carry off and conceal their still and fixtures, and escape the legal penalties incurred by criminal misconduct.

Suppose that these officers had been duly authorized by law, and were seeking to surprise a band of counterfeiters, and to seize the implements and materials of such unlawful business, could there be any doubt as to the right and duty of such officers to follow and watch a person whom they had reasonable grounds to suspect was endeavoring to communicate information that would frustrate their lawful purpose and efforts? This principle of common sense and common justice certainly ought and does apply to illicit distillers, who carry on their nefarious business in secret places, by night and on the Sabbath, and who usually have sentinels and signals to give warning of the approach of revenue officers. In some localities this just principle is not as fully recognized in cases of illicit distillation as it is in the case of other crimes.

I deeply regret the occurrence of the unfortunate transaction that has given rise to these proceedings, for it has resulted in a homicide, and it has deprived a faithful revenue officer of the government of his sight, of his capabilities of supporting his family, and left him only a life of suffering. Similar cases have often occurred in the course of the enforcement of the internal revenue laws relating to the illicit manufacture, removal, and sale of spirituous liquors. The violators of such laws have sometimes been killed, and they have often been the slayers of revenue officers engaged in the performance of official duty. Congress has made provision by statute for securing a fair and impartial trial of revenue officers in the courts of the United States, for acts done in the performance of official duty. Such provisions are just, reasonable, and constitutional. It is a high and imperative duty of the government to make provisions by law to secure a fair and impartial trial for officers who are charged with crime for obeying its mandates and enforcing its laws. The enactment of such laws by the government is the exercise of a necessary, in-

herent, and constitutional power of national sovereignty. Fifteen years ago cases like this caused much political, legislative, and forensic discussion, and some conflict of jurisdiction between state and federal courts. Most of the disturbing and perplexing questions of law involved in such cases have now been authoritatively settled by carefully considered decisions in state and national courts. *Tennessee* v. *Davis, supra; South Carolina* v. *Davis,* 107 U. S. 597, 2 Sup. Ct. Rep. 636; *State* v. *Hoskins,* 77 N. C. 530; *In re Neagle,* 39 Fed. Rep. 833. In the *Neagle Case* the authorities are ably and fully reviewed, and among others the following principle is announced:

"It is the exclusive province of the United States courts to ultimately and conclusively determine any question of right, civil or criminal, arising under the laws of the United States. It is therefore the prerogative of the national courts to construe the national statutes, and determine upon *habeas corpus* whether a homicide, for which the petitioner is charged with murder by the state authorities, was the result of an 'act done in pursuance of a law of the United States,' and, when that question has been determined in the affirmative, the prisoner will be discharged, and the state has nothing more to do in the matter."

This case has just been affirmed by the United States supreme court. 10 Sup. Ct. Rep. 658.

Being well satisfied from a decided preponderance of the evidence in this case that the petitioners were acting in the line of official duty when the homicide occurred, and that they are not guilty of murder, as charged in the state process under which they were arrested, it is ordered that they be discharged.